**SI MANAGEMENT L.P., a Limited Partnership, Synthetic Management G.P., a General Partnership, Leonard Chill, Jon P. Beckman, W. Wayne Freed, Ralph Kenner, W. Gardner Wright, Chill Investments, Inc., Beckman Investments, Inc., Freed Investments, Inc., Kenner Investments, Inc., Wright Investments, Inc., and Synthetic Industries, L.P., a Delaware Limited Partnership, Defendants Below, Appellants,**

v.

**Dwight E. WININGER and Gary T. Charlebois, on behalf of themselves and all others similarly situated, and derivatively on behalf of Synthetic Industries, L.P., Plaintiffs Below, Appellees.**

No. 457, 1997.

Supreme Court of Delaware.

Submitted: Jan. 5, 1998.
Decided: March 19, 1998.

---

A. Gilchrist Sparks, III, and R. Judson Scaggs, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington; Bruce D. Angiolillo (argued); Simpson Thacher & Bartlett, New York City, of Counsel, for Appellants.

Craig B. Smith, David A. Jenkins (argued), and Michele C. Gott of Smith, Katzenstein & Furlow, L.L.P., Wilmington; and Derek G. Howard, Gilmur R. Murray, and Alex J. Luchenitser, of the Mills Law Firm, Greenbrae, CA, for Appellees.

Before VEASEY, C.J., HOLLAND and HARTNETT, JJ.

VEASEY, Chief Justice:

In this interlocutory appeal of a preliminary injunction entered by the Court of Chancery, we affirm, finding that the trial court did not abuse its discretion. The underlying question of contract interpretation presented here in the context of a limited partnership agreement is an important one of first impression in this jurisdiction.

On the limited record before the trial court on the motion for preliminary injunction, it appears that the General Partner had entered into a limited partnership agreement with approximately 1,850 limited partners and that the agreement was ambiguous, at best, on amendment processes. Based on that premise, we find that the circumstances are such that any ambiguity in the agreement regarding those amendment processes should be construed against the general partner, and the court should not normally look to extrinsic evidence.

On final hearing to determine whether a permanent injunction is warranted, the Court of Chancery should examine the circumstances under which the parties entered into the limited partnership agreement and make a final determination whether those circumstances continue to be more analogous to a corporate setting than to that of a negotiated bilateral contract.

### Facts and Status of Proceedings

Synthetic Industries L.P., a Delaware limited partnership (the "Limited Partnership"), was formed for the purpose of acquiring and did acquire all the stock of Synthetic Industries, Inc. ("the Company"), a producer of polypropylene fabric and fiber. SI Manage-

ment L.P. is the general partner (the "General Partner") of the Limited Partnership.

There are approximately 1,850 investors who became limited partners in the Limited Partnership by executing a limited partnership agreement ("the Agreement"). The Limited Partnership's ownership of stock in the Company dropped from 100% to approximately 67% in November 1996, when the Company launched an initial public offering ("the IPO") of newly issued stock. The Limited Partnership's share of the Company's stock was not offered in the IPO due to the opposition by a number of limited partners to a sale of their interest in the Company. Issues arose concerning the strategy that would provide the best return to the limited partners for their interests, and those issues culminated in this litigation.

This action was commenced by Dwight Wininger, a limited partner, on February 11, 1997. Wininger alleged that the General Partner and the individuals and entities who control the General Partner breached their fiduciary duties to the limited partners by failing to attempt a sale of either the Limited Partnership's shares of the Company's stock or the Company as a whole to a single purchaser for a control premium.

After the action was filed, the defendants announced a proposed "Plan of Withdrawal and Dissolution" (the "Plan"). Under the Plan, each limited partner was given the choice of either (1) exchanging a portion or all of his or her interest in the Limited Partnership for cash through a public offering of stock or (2) receiving at a later date his or her proportionate interest in shares in the Company. It is undisputed that implementation of the Plan would require amendments to the Agreement to eliminate restrictions concerning the withdrawal and distribution of partnership interests.

On September 19, 1997, the defendants filed a Joint Proxy Statement and Prospectus with the Securities and Exchange Commission and began soliciting proxies in support of the Plan. Shortly thereafter, Wininger,

joined by Gary Charlebois, another limited partner, moved to amend the original complaint and for a preliminary injunction enjoining the implementation of the Plan. The plaintiffs alleged that the amendments necessary to carry out the Plan were in violation of the Agreement.

The Court of Chancery agreed with the plaintiffs and granted a preliminary injunction,[1] but expressed some uncertainty whether consideration of extrinsic evidence was appropriate under our holding in *Kaiser Aluminum Corp. v. Matheson.*[2] Without considering defendants' offer of extrinsic evidence, the trial court's ruling was based on the reasonable probability of success on the merits, thus supporting plaintiffs' interpretation of the Agreement. According to that interpretation, an amendment to the Agreement by a majority in interest of the limited partners allowing implementation of the Plan would require an opinion of special counsel and would be subject to certain restrictions. The Court of Chancery held that implementation of the Plan would violate the terms of the Agreement. The court enjoined only the implementation of the Plan and allowed the holding of a vote at a special meeting of the limited partners, stating:

> ... I think that it would be appropriate to limit the injunction to the implementation of the plan if it is approved rather than to the vote itself.
>
> A lot of expense and effort has been put into placing this before the limited partners, and there might be some benefit in finding out their view on the proposal. If it is defeated, I assume the case is moot. If it is approved by a strong majority, perhaps that would move the parties to reconsidering their positions or coming to some accommodation. In any event, the principle is that injunction should be as limited as possible, and I see no need to enjoin the meeting.
>
> If the proposal is approved, perhaps we can have a quick final decision, particularly

1. *Wininger v. Si Management L.P.*, Del.Ch., C.A. No. 15538, Ruling of the Court on Plaintiffs' Motion for Preliminary Injunction (Oct. 23, 1997), and Order (Oct. 27, 1997).

2. Del.Supr., 681 A.2d 392, 397–99 (1996) (involving an ambiguity in a corporate document relating to the conversion rights of preferred stockholders).

if there is no significant extrinsic evidence or, under the rule stated in [*Kaiser Aluminum v. Matheson* ], it would be inappropriate to consider extrinsic evidence.[3]

This Court accepted defendants' petition for an interlocutory appeal.[4] Appellate review of the interlocutory order granting the preliminary injunction is appropriate in this case. An important issue of law is implicated—namely, the proper judicial approach to contract interpretation of a limited partnership agreement in a setting where the general partner solicits numerous investors who become limited partners by signing a comprehensive agreement.

### Standard and Scope of Review

■ We review the grant or denial of a preliminary injunction for abuse of discretion, but without deference to the legal conclusions of the trial court.[5] The decision whether to grant a preliminary injunction must be based on a showing by plaintiff of three factors: (1) a reasonable probability of success on the merits; (2) irreparable harm; and (3) a balance of equities in its favor.[6]

In this case, the finding by the Court of Chancery that plaintiffs had a reasonable probability of success on the merits was central to the court's decision, and the court's ruling gave little attention to the other two requirements. Nevertheless, we find no abuse of discretion in the court's holding that damages from a breach of the Agreement were not quantifiable, thereby presenting the threat of irreparable harm. Moreover, the strict limit placed on the scope of the injunction represented an appropriate, if not explicit, weighing of equities on the part of the court.

We focus our review on the legal principles applied by the Court of Chancery on the construction of the Agreement, which we consider *de novo*.[7] Specifically, this case presents two questions: (1) whether there is any ambiguity in the Agreement; and (2) if so, whether the ambiguity should be construed against the General Partner, as is the case with certain corporate instruments,[8] or whether the Court of Chancery should consider extrinsic evidence as it normally would in the case of an ambiguous, negotiated bilateral contract.[9] On the limited record presented, we apply the former principle rather than the latter.

### The Contract Terms in Question

The chief issue decided by the Court of Chancery was whether there was a reasonable probability of success on the merits in favor of the plaintiffs. That issue turns on a question of contract interpretation relating to (1) the need for an opinion of special counsel when the General Partner proposes an amendment to the Limited Partnership Agreement; and (2) compliance with the restrictions in the Agreement on the nature of the amendments.

The parties dispute the interpretation of two provisions in the Agreement. Paragraph 12(d) establishes the guidelines for calling meetings and sets forth prerequisites for the limited partners' right to vote as follows:

> Except as provided below, meetings of the Partners may be called by the General Partner, or by the Limited Partners holding more than ten percent (10%) of the then outstanding Interest for any matters for which the Partners may vote as set forth in this Agreement or for a report from the General Partner on matters pertaining to the Partnership business and activities.... Anything in this Agreement to the contrary notwithstanding, the rights of the Limited Partners as outlined in this

3. *Wininger,* Ruling of the Court on Plaintiffs' Motion for Preliminary Injunction at 12–13.

4. *Si Management L.P. v. Wininger,* Del.Supr., No. 457, 1997, Hartnett, J. (Nov. 7, 1997) (ORDER).

5. *Kaiser,* 681 A.2d at 394.

6. *Id.; Allen v. Prime Computer, Inc.,* Del.Supr., 540 A.2d 417, 419 (1988).

7. *See Kaiser,* 681 A.2d at 393–94 (reviewing *de novo* the Court of Chancery's interpretation of the meaning of corporate documents on which the court's grant of a preliminary injunction had been based).

8. *Id.* at 398–99.

9. *Eagle Industries, Inc. v. DeVilbiss Health Care,* Del.Supr., 702 A.2d 1228 (1997).

subparagraph 12(d) and in [subparagraph 12(h)(ii) ] shall not come into existence or be effective in any manner unless and until (a) the Partnership has received an unqualified opinion of counsel of recognized standing, which counsel is selected by Limited Partners whose aggregate Interests exceeds 10% of the aggregate Interests of all of the Limited Partners ("Special Counsel"), and which opinion is affirmatively approved in writing by the same percentage in Interest of the Limited Partners as is required to take the action to which the opinion relates, as to the legality of such action, and (b) ... the Partnership has received an opinion of Special Counsel ... that such action may be effected without subjecting any Limited Partner to liability as a general partner under the laws of the State of Delaware or of any other jurisdiction in which the Partnership is doing business, ... and (c) ... the Partnership has received an opinion of Special Counsel ... that such action may be effected without changing the Partnership's status for tax purposes....

Under Paragraph 12(h)(ii), the Agreement may be amended by a majority in interest of the limited partners as follows:

Subject to subparagraph 12(d), this Agreement shall be amended upon the written request of Limited Partners whose Interests in the aggregate exceed fifty percent (50%) of the Interests of the Limited Partners who are then Partners in the Partnership setting forth the terms of the amendment so requested. Amendments made upon the request of such majority in Interest of the Limited Partners shall be made in accordance with the terms set forth in such written request, provided, however, that no such amendment shall in any way (A) alter, modify or expand the rights, obligations and liabilities of a General Partner without the consent of all General Partners, (B) alter or modify the percentage of Distributions or the Distributions allocated to each Partner, (C) increase the liability or the required Capital Contribu-

tion of any Partner without the consent of such Partner, (D) diminish the rights, obligations and liabilities of any Limited Partner without the consent of such Limited Partner, or (E) amend the specific rights granted to the Limited Partners herein.

From these provisions, defendants argue that the Agreement can be amended in either of two primary ways: (1) on the initiative of the limited partners through the written request procedure set forth in Paragraph 12(h)(ii); or (2) as in this case, on the initiative of the General Partner by a vote of a majority in interest of the limited partners at a meeting called by the General Partner pursuant to Paragraph 12(d). According to defendants, an opinion of special counsel is required only when the "rights of the Limited Partners" to make amendments are exercised by written request under Paragraph 12(h)(ii). Similarly, defendants contend that the restrictions in Paragraph 12(h)(ii) do not apply here where an amendment was initiated by the General Partner by means of its request for a meeting of the limited partners. In support of this interpretation, defendants offer extrinsic evidence consisting of language included in the original Offering Memorandum sent to prospective limited partners. That Offering Memorandum stated, in part:

Meetings of the Limited Partners for any purpose may be called by the General Partner and shall be called by the General Partner upon request ... of the Limited Partners. Meetings called by the Limited Partners shall not be called, and the actions described above [including the amendment of the Partnership Agreement] shall not be taken, unless the Partnership has received an unqualified opinion of counsel....[10]

Plaintiffs argue that, under Paragraph 12(d), an opinion of special counsel is required before the limited partners may take action, regardless of whether a meeting was called by the limited partners or by the General Partner. Furthermore, plaintiffs

---

**10.** Although we hold that extrinsic evidence is probably inadmissible here (at least on the preliminary injunction record), we find some appeal as well in plaintiffs' argument that the Offering Memorandum, even if considered by the Court, does not support defendants' interpretation, or is itself ambiguous.

contend that the restrictions listed in Paragraph 12(h)(ii) apply to *any* amendment approved by the requisite percentage of the limited partners.

### Ambiguity in the Agreement

■ The key phrases from Paragraphs 12(d) and 12(h)(ii) in the Agreement were not drafted with the clarity necessary to avoid disagreement over their meaning. It is clear that the General Partner may call certain meetings under Paragraph 12(d). If a meeting called by the General Partner results in an amendment to the Agreement, however, the text of the Agreement is ambiguous, at best, on whether an opinion of special counsel is required and whether the restrictions in Paragraph 12(h)(ii) apply. Defendants argue, in essence, that a detached third party looking at this Agreement could reasonably conclude: (1) that an opinion of special counsel need not be obtained before a majority in interest of the limited partners may take action at a meeting called by the General Partner; and (2) that the specific restrictions of Paragraph 12(h)(ii) are not applicable to amendments that are initiated by the General Partner under Paragraph 12(d).

On the other hand, plaintiffs' argument that these provisions unambiguously support their view of the Agreement has some appeal. But we need not reach that question at this interlocutory stage because we hold that these provisions are, at best, ambiguous.

> Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language. When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity.[11]

Since we conclude that the Agreement is ambiguous, we turn to the applicable principles of contract interpretation.

### Principles of Contract Interpretation Applicable Here

■ It has long been established that ambiguous provisions in contracts of insurance are to be construed against the insurer. In our recent decision in *Penn Mutual Life Ins. Co. v. Oglesby*,[12] which is typical of this line of cases, we said:

> The starting point is the approach to interpreting insurance contracts. They must be interpreted in a common sense manner, giving effect to all provisions so that a reasonable policyholder can understand the scope and limitation of coverage. It is the obligation of the insurer to state clearly the terms of the policy, just as it is the obligation of the issuer of securities to make the terms of the operative document understandable to a reasonable investor whose rights are affected by the document. Thus, if the contract in such a setting is ambiguous, the principle of *contra proferentem* dictates that the contract must be construed against the drafter.

> The policy behind this principle is that the insurer or the issuer, as the case may be, is the entity in control of the process of articulating the terms. The other party, whether it be the ordinary insured or the investor, usually has very little say about those terms except to take them or leave them or to select from limited options offered by the insurer or issuer. Therefore, it is incumbent upon the dominant party to make terms clear. Convoluted or confusing terms are the problem of the insurer or issuer—not the insured or investor.[13]

As we observed in *Penn Mutual* and in *Kaiser*, a point of departure is to bring to bear on certain corporate documents involving the rights of investors the same *contra proferentem* principle of interpretation that

---

11. *Eagle,* 702 A.2d at 1232; *see also Rhone-Poulenc v. American Motorists Ins.,* Del.Supr., 616 A.2d 1192, 1196 (1992).

12. Del.Supr., 695 A.2d 1146 (1997).

13. *Id.* at 1149–50 (footnotes omitted); *see also Continental v. Burr,* Del.Supr., 706 A.2d 499 (1998); *Phillips Home Builders Inc. v. The Travelers Ins. Co.,* Del.Supr., 700 A.2d 127, 129 (1997); *Emmons v. Hartford Underwriters Ins. Co.,* Del. Supr., 697 A.2d 742, 745 (1997).

is applicable to insurance contracts involving the rights of insureds.[14]

In *Eagle*, however, we held that, if there existed an ambiguous provision in a negotiated bilateral agreement, extrinsic evidence should be considered if it would tend to help the court interpret such a provision.[15] In disapproving the overbroad language contained in our 1987 opinion in *Klair v. Reese*,[16] we undertook to cabin the use of extrinsic evidence.[17] In doing so, we distinguished the question of when resort to extrinsic evidence was inappropriate in interpreting contractual language from the duty of the court to consider the factual setting whereby the contract came into existence:

> There may be occasions where it is appropriate for the trial court to consider some undisputed background facts to place the contractual provision in its historical setting without violating [the principle that extrinsic evidence may be considered only in the presence of contractual ambiguity]. But the trial court must be careful in entertaining background facts to avoid encroaching on the basic principles set forth herein.[18]

In *Eagle*, the fundamental facts that led inexorably to the need to consider extrinsic evidence established that the two parties to the agreement (business people on an equal footing with each other) negotiated back and forth on the key indemnity provision and its risk-allocation consequences.

■ Here, the setting in which the Limited Partnership came into existence appears on this record to be quite different from that in *Eagle*. This was not a bilateral negotiated agreement. Rather, it appears that the General Partner[19] solicited and signed on 1,850 investors to the Agreement that those investors had no hand in drafting. Based on that premise, the principle of *contra proferentem* applies. Accordingly, ambiguous terms in the Agreement should be construed against the General Partner as the entity solely responsible for the articulation of those terms. On remand and final hearing on a permanent injunction, the trial court should determine whether these plaintiffs actually did engage in negotiations with the General Partner on the issues in question here.

■ A court considering extrinsic evidence assumes that there is some connection between the expectations of contracting parties revealed by that evidence and the way contract terms were articulated by those parties. Therefore, unless extrinsic evidence can speak to the intent of *all* parties to a contract, it provides an incomplete guide with which to interpret contractual language. Thus, it is proper to consider extrinsic evidence of bilateral negotiations when there is an ambiguous contract that was the product of those negotiations, as in *Eagle*.[20]

---

**14.** *Penn Mutual*, 695 A.2d at 1149–50; *Kaiser*, 681 A.2d at 398–99. We need not decide when a general partner's representations in an Offering Memorandum to prospective limited partners may furnish the basis for a claim against the general partner for misrepresentation. Moreover, we express no opinion on the admissibility of a proxy statement to supplement or explain the effect of a corporate transaction (such as a merger or amendment to a certificate of incorporation) on which stockholders are being asked to vote.

**15.** *Eagle*, 702 A.2d at 1232–33.

**16.** Del.Supr., 531 A.2d 219 (1987).

**17.** *Eagle*, 702 A.2d at 1232 n. 7.

**18.** *Id.*

**19.** In supplemental briefing before this Court, defendants argue that the principle of *contra proferentem* should not apply in this case where defendants purchased the general partnership interest after the Agreement was already in place. According to the defendants, they entered into the Agreement as the current General Partner "after [the Agreement] was drafted and, like the limited partners, accepted the terms as written." From the record it is clear, however, that the General Partner, against which ambiguities in the Agreement will be construed under the principle of *contra proferentem*, is and has always been SI Management L.P. A change in ownership of the general partnership interest does not excuse the responsibility for the effect of contractual terms that the General Partner bears.

**20.** We note that Paragraph 12(h)(i) of the Agreement contains a strongly-worded integration clause, which provides in pertinent part:

> This agreement constitutes the entire agreement among the Partners concerning the subject matter hereof. No covenant, representation or condition not expressed in this Agreement shall affect or be effective to interpret, change, or restrict the express provisions of this Agreement.

On the limited record before us in this case, however, it appears that the 1,850 investors comprising the limited partnership reacted to a "take it or leave it" proposal by the General Partner without meaningful individualized negotiations. Because the articulation of contract terms in this case appears to have been entirely within the control of *one party*—the General Partner—that party bears full responsibility for the effect of those terms. Accordingly, extrinsic evidence is irrelevant to the intent of *all* parties at the time they entered into the agreement.

### *Conclusion*

We affirm the result reached by the Court of Chancery and remand to that Court to make a final determination concerning the factual circumstances of the contractual setting and to apply the legal principles set forth in this Opinion.

Although plaintiffs claim this provision supports their position, we need not decide the effect of this provision at this stage of the proceedings. *Cf. Eagle,* 702 A.2d at 1233 n. 10 (integration provision does not necessarily bar consideration of extrinsic evidence in a negotiated bilateral contract).