# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| INTERMEC IP CORP., and<br>INTERMEC TECHNOLOGIES CORP., | ) ) ) | |
| Plaintiffs/<br>Counterclaim Defendants, | ) ) ) ) | |
| v. | ) ) | C.A. No. N20C-03-254<br>PRW CCLD |
| TRANSCORE, LP, and TRANSCORE<br>HOLDINGS, INC., | ) ) ) ) | |
| Defendants/<br>Counterclaim Plaintiffs. | ) ) | |

Submitted: July 25, 2023
Decided: August 23, 2023
Issued: August 31, 2023\*

## <u>DECISION AFTER TRIAL</u>

Steven L. Caponi, Esquire, Matthew B. Goeller, Esquire, K&L GATES LLP, Wilmington, Delaware; Michael S. Nelson, Esquire, Jessica L.G. Moran, Esquire, Terrina G. LaVallee, Esquire, K&L GATES LLP, Pittsburgh, Pennsylvania, *Attorneys for Plaintiffs/Counterclaim Defendants Intermec IP Corp. and Intermec Technologies Corp.*

Jason A. Cincilla, Esquire, William B. Larson, Jr., Esquire, MANNING GROSS + MASSENBURG LLP, Wilmington, Delaware, Lela M. Hollabaugh, Esquire, Kimberly M. Ingram-Hogan, Esquire, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, *Attorneys for Defendants/Counterclaim Plaintiffs TransCore, LP and TransCore Holdings, Inc.*

**WALLACE, J.**

In November 2008 TransCore LP and TransCore Holdings, Inc. (collectively "TransCore") and Intermec IP Corp. and Intermec Technologies Corp. (collectively "Intermec")[1] entered into a Cross-Licensing Agreement (the "Agreement"). That Agreement required TransCore to pay Intermec for the use of Intermec's patents in TransCore's RFID products. In 2016, while the agreement was still in force, Intermec invoked its contractual audit right. Ernst & Young ("EY") was then hired to conduct an audit of the royalty payments that TransCore sent to Intermec for use of its patents. According to EY's audit report, TransCore underpaid Intermec. EY based its conclusion on its calculation of net present value using the gross invoice price of the product instead of the adjusted price that TransCore had been using to calculate and pay royalties.

Intermec demanded payment, TransCore refused, insisting that EY's use of gross invoice price instead of adjusted price was incorrect, and therefore, EY's calculations and audit conclusions were wrong. Intermec then filed suit against TransCore for the purported underpayments. In response, TransCore counterclaimed—alleging that it had erroneously been paying Intermec for expired patents or patents that were not used in TransCore products.

---

\*   This decision is issued after consideration of the parties' requests for redaction of certain confidential information and with the Court's own necessary corrections and clarifications.

[1]   In September 2013 Honeywell purchased Intermec. Pre-Trial Stipulation & Order ("PTO") ¶ 6 (D.I. 179). To avoid any confusion, the Court refers to the Plaintiffs as "Intermec" and not "Honeywell."

After pre-trial motion practice,[2] what remains pending before the Court is Intermec's breach-of-contract claim and TransCore's breach of the implied covenant of good faith and fair dealing counterclaim. The Court held trial on these remaining claims without a jury.

## I. THE TRIAL

The Court conducted a six-day bench trial, and the case was deemed fully submitted for decision after the parties submitted their post-trial briefing.[3]

During trial, the Court heard from and considered the testimony of the following witnesses:

| | |
|---|---|
| Janis Harwell | George Mcgraw |
| William Thomas | Kelly Gravelle |
| Taylor Smith | Richard Nefzer |
| Christopher Gerardi | Misty L. Decker |

In addition, the Court considered the trial deposition testimony of Taylor Smith, Floyd Carpenter, Francia Lucio, and Stephanie Schwencer.[4]

---

[2] *See Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435 (Del. Super. Ct. Aug. 16, 2021) (Court's decision on parties' motions to dismiss and for judgment on the pleadings); D.I. 191 (order denying the parties' cross-motions for summary judgment and motions *in limine*). The Court does not here reconstitute the full factual background of the parties' relationship and of this litigation. For that, the interested reader can turn to those earlier decisions just mentioned. The parties are thoroughly familiar with that background and the trial evidence.

[3] D.I. 217 (TransCore's Post-Trial Opening Br.); D.I. 218 (Intermec's Post-Trial Opening Br.); D.I. 222 (TransCore's Post-Trial Answering Br.); D.I. 223 (Intermec's Post-Trial Answering Br.).

[4] D.I. 233 (Taylor Smith Depo. Tr.); D.I. 234 (Floyd Carpenter Depo. Tr.); D.I. 235 (Francia Lucio Depo. Tr.); D.I. 236 (Stephanie Schwencer Depo. Tr.).

The parties also submitted a number of exhibits.[5]

At the close of Intermec's case-in-chief, TransCore moved for judgment as a matter of law,[6] which the Court denied.[7]

## II. FINDINGS OF FACT

It is difficult at times in the trial of certain actions to fully and cleanly segregate findings of fact from conclusions of law. To the extent any one of the Court's findings of fact here might be more appropriately viewed as a conclusion of law, that finding of fact may be considered the Court's conclusion of law on that point.[8]

### A. THE PARTIES' CROSS-LICENSING AGREEMENT

In November 2008, Intermec and TransCore executed their Cross-Licensing Agreement (hereinafter, "the Agreement").[9] Under the Agreement,

> Intermec granted TransCore a royalty-bearing license under the Intermec Licensed Patents listed in Section A of Exhibit 3 to the License Agreement to, among other things, make and sell Licensed Products. Intermec also granted TransCore a non-royalty-bearing license under the Intermec Licensed Patents listed in Section B of Exhibit 3 to the License Agreement to, among other things, make and sell Licensed Products.[10]

---

[5]   *See* PTO at 18-38.

[6]   4/4/23 Trial Tr. at 238 (D.I. 225).

[7]   4/5/23 Trial Tr. at 23 (D.I. 232).

[8]   *See Facchina Constr. Litigs.*, 2020 WL 6363678, at *2 n.12 (Del. Super. Ct. Oct. 29, 2020) (collecting authority).

[9]   JX-1 ("Agreement"); PTO ¶ 1.

[10]   PTO ¶ 3.

Additionally, under the Agreement, "TransCore granted Intermec a non-royalty-bearing license under the TransCore Licensed Patents listed in Section A of Exhibit 4 to the License Agreement solely outside of the Transportation Markets to, among other things, make and sell TransCore Licensed Products."[11]

Within thirty days of the end of each quarter, TransCore was required to make royalty payments to Intermec for that just-past quarter and to submit royalty reports.[12]

In 2016, Intermec retained EY to conduct an audit of TransCore's royalty reports and payments—the audit covered the period of July 1, 2012, to June 30, 2016.[13]

On March 27, 2017, EY issued its report.[14] According to that report, TransCore had underpaid Intermec.[15] TransCore objected to the report's conclusion and its computation of the Net Sales Value of multiprotocol devices.[16]

Although not immediately, Intermec demanded payment.[17] TransCore denied

---

[11] PTO ¶ 4.

[12] PTO ¶¶ 7-8.

[13] PTO ¶¶ 10-11.

[14] PTO ¶ 12.

[15] JX-48 ("EY Report") § 3.

[16] PTO ¶ 14.

[17] PX-28 (Dec. 7, 2020 letter from Intermec to TransCore).

that it had underpaid royalties.[18]  And Intermec sued.

## B. THE PRODUCTS AT ISSUE

While complicated by the intricacies of technological advancement, the dispute here is fundamentally a bundle versus stick question—whether royalties were to be calculated on the bundle, or whether they were to be calculated on the stick.

TransCore sells RFID readers and tags.[19]  This dispute is focused on TransCore multiprotocol readers.  A multiprotocol reader reads multiple protocols, that is, it reads multiple "languages."[20]  In order to read those languages, it must have, in laymen's terms, a translator, such as a daughterboard which allows the reader to read certain protocols.[21]  For the TransCore readers at issue here to read certain protocols,[22] the daughterboard must practice Intermec-patented technology.[23]

---

[18]  PX-40 (Feb. 5, 2021 response letter from TransCore to Intermec).

[19]  4/5/23 Trial Tr. at 39.  Again, for a fuller explanation of the technology and products involved here, the interested reader can look back to the Court's earlier decision on TransCore's motion to dismiss. *Intermec*, 2021 WL 3620435, at *2-3.

[20]  4/5/23 Trial Tr. at 39-40.

[21]  *See id.* at 40-42, 95.

[22]  *Id.* at 41 (explaining SeGo and eGo are the two protocols that use Intermec-patented technology).

[23]  4/6/23 Trial Tr. at 30-32 (D.I. 230) (explaining the difference between an E6 reader that didn't read SeGo and eGo protocols and an E6 reader that did was the "daughterboard containing FPGA that basically essentially contains the SeGo and eGo protocols").

If the daughterboard is removed, the reader can still read other protocols, but it won't be able to read the protocols that use Intermec-patented technology.[24]

TransCore doesn't sell the individual Intermec-patented technology, *i.e.* the stick, to the customer, TransCore sells the full multiprotocol reader, *i.e.* the bundle.[25] The question here is whether the Agreement required that royalties be paid using the bundled price, which is the gross invoice price of a multiprotocol reader with Intermec (and other) reading protocols therein or paid using the stick price, which is TransCore's adjusted price—that is, the portion of the reader's price TransCore attributes to Intermec's patented technology.

## C. CERTAIN KEY TRIAL TESTIMONY

The Court first heard testimony from Intermec's former General Counsel Janis Harwell.[26] Ms. Harwell explained that Intermec licensed its patents to multiple companies, including TransCore.[27] Along with the royalty payments, Intermec would receive a quarterly report indicating "types of products that had been sold, the invoice price for the product, the deductions that were allowed under the contracts from the invoice price, the percentage of the royalty that was applicable to whatever those category of devices was, and then the calculation of what the amounts payable

---

[24]  *Id.* at 32-33.

[25]  *Id.* at 95.

[26]  4/3/23 Trial Tr. at 49, 55-56 (D.I. 224).

[27]  *Id.* at 61.

were."[28] To protect itself from "misrepresent[ation]" by a licensee, Ms. Harwell said the Agreement gave Intermec audit rights.[29]

Ms. Harwell also recounted that the parties neither discussed royalty payments specific to multiprotocol devices,[30] nor what to do in the event that TransCore overpaid a royalty amount.[31] On cross-examination, Ms. Harwell said that she

---

[28] *Id.* at 61-62.

[29] *Id.* at 62.

[30] *See id.* at 93

> Q. Did TransCore ever suggest to you that multiprotocol devices should be treated differently under the 2008 agreement?
>
> A. In terms of royalty calculations?
>
> Q. Yes, ma'am.
>
> A. No.

*Id.* at 149

> Q. Ms. Harwell, my question was did you have any specific discussions that related to multiprotocol RFID readers or tags? Was the term 'multiprotocol' ever discussed with anybody at TransCore?
>
> A. No.

[31] *Id.* at 126-27.

> Q. Does the contract anywhere provide that TransCore has a right to recover as a matter of contract overpayments it makes on any royalties?
>
> A. There's no such provision.
>
> Q. To your knowledge, did TransCore ever raise the potential to add a clause in the contract dealing with potential overpayments?
>
> A. No.
>
> Q. In your mind, was the risk of overpayments something that needed to be addressed in the contract?
>
> A. No. I guess another way to say it is, my focus was always on underpayments, because that's the place where Intermec was most likely to have exposure was to underpayments by the licensees.

assumed TransCore products needed to use Intermec patents to function.[32]

EY Managing Director William Thomas was the executive-in-charge of the audit.[33] He testified that, based on EY's review of the Agreement and the quarterly royalty payments, TransCore had underpaid Intermec.[34] According to Mr. Thomas, EY's determination was based on its own independent evaluation of the Agreement.[35] Mr. Thomas told the Court that he had previously conducted ten royalty audits, five of which involved Intermec.[36]

Honeywell[37] executive Taylor Smith testified that after Intermec informed TransCore of the now-complained-of underpayment TransCore refused to pay up.[38] Mr. Smith also discussed interest Intermec believed was due.[39]

Intermec's expert witness, Christopher Gerardi, explained his analysis of the royalty payments owed by TransCore and the applicable interest for those late payments.[40]

---

[32] *See id.* at 140.

[33] 4/4/23 Trial Tr. at 27-28 (stating his role in the audit was primarily "oversight" and "performing the final review of the draft reports.").

[34] *Id.* at 32.

[35] *Id.* at 67.

[36] *Id.* at 14.

[37] Honeywell purchased Intermec in September 2013. PTO ¶ 6.

[38] 4/4/23 Trial Tr. at 154-55, 164-66.

[39] *Id.* at 169-73.

[40] *Id.* at 192, 201-02, 219.

Former TransCore executive, George McGraw, testified that, under the Agreement, royalties were to be paid on "[t]he portion of the bundled product that practiced . . . one or more of Intermec's patents."[41]

Current TransCore executive, Kelly Gravelle, testified as to how he discovered TransCore overpaid for Intermec patents that he believes either had expired or were not used.[42] In addition, Mr. Gravelle explained how TransCore products could still function if Intermec-patented technology were removed.[43]

TransCore finance director, Richard Nefzer, testified and insisted that: (1) Intermec never reported an issue with the royalty reports and payments to TransCore; and (2) TransCore overpaid Intermec and is due a refund.[44]

TransCore's Expert, Misty Decker, testified as to how she derived the amount TransCore overpaid Intermec for the use of expired or unincorporated patents.[45]

### III. GENERAL LEGAL PRINCIPLES

Though the Court sits without a jury, it has applied the same principles of law in its deliberations and consideration of each individual claim and counterclaim that it would have more formally instructed a jury to follow. The Court may in this

---

[41] 4/5/23 Trial Tr. at 31, 42.

[42] 4/6/23 Trial Tr. at 10, 34-35, 41.

[43] *Id.* at 32.

[44] 4/11/23 Trial Tr. at 13, 22 97, 100 (D.I. 231).

[45] 4/12/23 Trial Tr. at 5, 23-26 (D.I. 227).

-9-

writing highlight some of those most applicable to this particular case. But the fact that some particular point or concept may be mentioned here should not be regarded as any indication that the Court did not—during its deliberations—consider all legal principles applicable to this case and to the parties' claim, counterclaims, and defenses.

In reaching its verdict, the Court has examined all exhibits submitted and considered the testimony of all witnesses, both direct and cross, live and by deposition. The Court has also considered the applicable Delaware case law that has defined the legal precepts applicable to the claims and defenses the parties have forwarded. The Court has applied the Delaware Rules of Evidence to the testimony and exhibits and only used for its deliberation that which would be allowed under those rules—consistent with the Court's knowledge of those rules and the specific rulings that may have been made and articulated both pre-trial and during the trial proceedings. And, of course, the Court has considered each party's respective arguments on the weight to be accorded the testimony and evidence.

The Court then reviewed and applied some of the very instructions that it would give a jury in these circumstances.[46]

---

[46] *See, e.g.,* Del. Super. Ct. Civ. Pattern Jury Instr. 4.1 (Burden of Proof by a Preponderance of the Evidence); *id.* at 4.2 (Evidence Equally Balanced); *id.* at 23.1 (Evidence—Direct or Circumstantial); *id.* at 23.9 (Credibility of Witnesses—Weighing Conflicting Testimony); *id.* at 23.10 (Expert Testimony).

In this particular case, Intermec carries the burden of proof by a preponderance of the evidence on its only remaining claim, Count I (Breach of Contract); TransCore carries the burden of proof by a preponderance of the evidence on its only remaining counterclaim, Count III (Breach of the Implied Covenant of Good Faith and Fair Dealing).[47]

## IV. PARTIES' CONTENTIONS

Intermec says that TransCore breached the Agreement in two separate ways: (1) TransCore breached the Agreement by failing to pay the underpayment identified by EY because, according to Intermec, Section 3.5 of Exhibit B made the auditor's conclusion binding on the parties; and (2) TransCore breached Section 3 by underpaying Intermec royalties stemming from TransCore's use of an adjusted price to calculate royalties on certain items.[48]

In response, TransCore asserts two defenses: (1) the equitable doctrine of acquiescence[49]; and (2) the three-year statute of limitations for breach of contract.[50]

TransCore goes on to say that it is actually Intermec that breached the

---

[47] *See Facchina Constr. Litigs.*, 2020 WL 6363678, at *14 (defining burden of proof in trial of such claims and counterclaims (citing *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) (defining preponderance of the evidence); *Oberly v. Howard Hughes Med. Inst.*, 472 A.2d 366, 390 (Del. Ch. 1984))).

[48] Intermec's Post-Trial Opening Br. at 17-21.

[49] TransCore's Post-Trial Opening Br. at 24.

[50] *Id.* at 34-35.

Agreement by not returning overpayments.[51] Those overpayments, says TransCore, were the result of its mistaken belief that it was using certain Intermec patents that either it wasn't using or that had expired.[52]

In response to TransCore's counterclaim, Intermec asserts two defenses: (1) the prior material breach doctrine[53]; and (2) the voluntary payment doctrine.[54]

## V. FINDINGS AND VERDICT

"To recover on a breach-of-contract claim, a party must prove the existence of an enforceable contract; the party performed or was ready to perform; that the other contracting party failed to perform; and that the failure to perform caused damages."[55] The parties do not dispute they had a valid contract.[56] So, what must be decided on Intermec's claim is: (1) whether Intermec performed under the Agreement; (2) whether TransCore breached the Agreement; and (3) whether Intermec adequately supported its alleged damages.

To recover for breach of the implied covenant of good faith and fair dealing, a party must prove "a specific implied contractual obligation, a breach of that

---

[51]   *Id.* at 3-4.

[52]   *Id.*

[53]   Intermec's Post-Trial Opening Br. at 35.

[54]   *Id.* at 31-33.

[55]   *Gerstley v. Mayer*, 2015 WL 756981, at *5 (Del. Super. Ct. Feb. 11, 2015) (cleaned up) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

[56]   *See* PTO ¶ 1.

obligation by the defendant, and resulting damage to the plaintiff."[57] So what must be determined on TransCore's counterclaim is: (1) whether an implied covenant exists; (2) whether TransCore performed under the Agreement; (3) whether Intermec breached the implied covenant; and (4) whether TransCore supported its alleged damages.

## A. INTERMEC HAS NOT CARRIED ITS BURDEN ON ITS BREACH-OF-CONTRACT CLAIM (COUNT I).

Intermec says TransCore breached the Agreement by failing to pay $1,638,979—what it says (invoking Section 3.5) was the royalty underpayment determined by EY that is now absolute.[58] That purported royalty underpayment rests, in part, on the EY Report's conclusion "that the gross invoice price was not used to compute the NSV for the multiprotocol products" and "[i]nstead, an 'adjusted unit price' was used" by TransCore.[59] In Intermec's view, once EY calculated a figure, Section 3.5 was satisfied and that was the amount due.

Section 3 of the Agreement requires that royalties be paid using "Net Sales Value,"[60] which is "the gross invoice price or gross invoice fee received by

---

[57] *See Baldwin v. New Wood Resources, LLC*, 283 A.3d 1099, 1117-18 (Del. 2022) (citation and internal quotation marks omitted).

[58] Intermec's Opening Br. at 18; *see* EY Report § 1.

[59] EY Report § 3.3.

[60] Agreement § 3 (using Net Sales Value to calculate royalties).

[TransCore] for a Licensed Product" minus certain deductions.[61] In turn, Licensed Product means "RFID ASICs, RFID Inserts, Tags and/or Labels, Fixed RFID Readers, Portable RFID Readers, RFID Printers, RFID software and systems which incorporate such products and software[,] which, but for the licenses granted herein, would infringe one or more of the Intermec Licensed Patents, . . . ."[62]

The Agreement doesn't differentiate between single protocol devices and multiprotocol devices. In this absence, TransCore employed an adjusted price to calculate royalty payments.[63]

Intermec says TransCore breached the Agreement by (1) failing to repay the underpayment found in the EY Report, and (2) using an adjusted price methodology for calculating royalties, instead of certain devices' gross price.[64] TransCore admits to both and says the Agreement supports its actions.

The Court finds below that TransCore wasn't obligated via the audit provision to pay the amount suggested in the EY Report because that provision wasn't properly triggered. But the Court finds TransCore did breach the Agreement by historically calculating royalties using an adjusted price, instead of the contractually-required gross invoice price.

---

[61]  *Id.*, Ex 1 (defining Net Sales Value).

[62]  *Id.* § 1.8.

[63]  *See* JX-18 to JX-47 ("Quarterly Royalty Reports").

[64]  Intermec's Post-Trial Opening Br. at 17-21.

Ultimately though, Intermec, during the course of this contractual relationship, acquiesced to TransCore's adjusted price methodology. In turn, Intermec's post-acquiescence breach-of-contract claim is barred by that acquiescence. Additionally, for that part of the claim preceding the acquiescence, it is barred by the statute of limitations.

## 1. Intermec Cannot Seek Payment of the EY Calculation via Section 3.5.

Under Section 3.5 of Exhibit 2 to the Agreement, Intermec had long held the right to order an audit of TransCore's quarterly reports.[65] But that audit was to be performed by an "independent Third Party."[66] Specifically, the section provides:

> Intermec has the right, upon reasonable notice, through an independent Third Party, during usual business hours and not more than once per year, and subject to confidentiality restrictions reasonably required by Company, to audit the records of Company in order to verify any representations made (in quarterly reports or otherwise) by Company to Intermec about the matters described in paragraphs 3.2 and 1.4 of this Exhibit 2, as well as compliance with all license requirements contained herein. Company will assemble in paper and electronic form all documents that may be necessary or desirable for such audit. Should the results of any such audit by Intermec's representative demonstrate that any representations or payments made by Company resulted in an underpayment that exceeded more than one percent (1%) in any period, then Company will within 30 days after notice of such underpayment, pay Intermec such amount, together with a late payment fee calculated in accordance with Section 2.6 above. Intermec will bear the cost of such audit unless the audit reveals an underpayment larger

---

[65]  Agreement, Ex. B (General Terms and Conditions) § 3.5.

[66]  *Id.*

-15-

than ten percent (10%) for the period audited, in which case Company shall pay the reasonable expenses of the audit within 30 days of receiving the invoice for such expenses.

Under Exhibit 1 to the Agreement, "Third Party" is defined as "Persons other than Intermec or Company."[67] But "independent" is not defined.[68] Given that absence[69] (or the ambiguity created within the subject provision)[70] the Court might rightly rely on the dictionary definition of "independent" which Black's Law Dictionary defines as: (1) "Not subject to the control or influence of another"; (2) "Not associated with another (often larger) entity"; (3) "Not dependent or contingent on something else."[71] Too, the Court might resort to limited extrinsic evidence to interpret a provision and understand the parties' intent thereby.[72] Though, the Court should be careful and sparing when doing so.[73]

At trial, EY's Executive William Thomas was asked specifically whether EY

---

[67] *Id.*, Ex. 1 (additional definitions).

[68] And interestingly that same supposed "independent" actor required under Section 3.5 is in that very paragraph later labeled "Intermec's representative."

[69] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." (citations omitted)).

[70] *Sunline Com. Carriers, Inc. v. CITGO Petro. Corp.*, 206 A.3d 836, 847 (Del. 2019) (finding: "Here, the contract's terms contradict each other, are susceptible to two meanings, and are thus ambiguous.").

[71] *Independent*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[72] *See SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 42-43 (Del. 1998) ("[I]f there existed an ambiguous provision in a negotiated bilateral agreement, extrinsic evidence should be considered if it would tend to help the court interpret such a provision." (citation omitted)).

[73] *Id.*

was independent:

> Q. Okay. And you work at the direction of your client; correct?
>
> A. Yes.
>
> Q. And you -- in this case your client was Honeywell?
>
> A. Yes.[74]

When pressed further, Mr. Thomas explained that EY didn't work at the "direction" of Intermec, instead EY "work[ed] under the direction per the instruction of the contract."[75]

There were several troubling aspects of Intermec's interaction with EY that lead the Court to find that the "independence" expected and required under Section 3.5 was not proven here.[76]

First, during the life of the audit, Intermec exerted exclusive (some might say undue) control over EY. For example, in its December 21, 2016 Status Update, EY had yet to decide whether the Agreement required the gross invoice price or an adjusted price be used to calculate royalties.[77] But, as part of that status report, EY

---

[74]   4/4/23 Trial Tr. at 75

[75]   *Id.* at 76. Mr. Thomas also stated that EY had previously worked for Intermec. *Id.* at 79. And Mr. Thomas admitted that while he had EY's ultimate supervisory sign-off authority, he was not nearly as familiar with this particular audit's process as others at EY would have been. *See id.* at 78-79. Indeed, Mr. Thomas had minimal knowledge of the details and day-to-day of this particular audit. *See id.*; *see also id.* at 10, 27-28 (explaining that the manager—which Mr. Thomas wasn't— is "responsible for overseeing the day-to-day execution of the fieldwork").

[76]   Recall, on this claim, Intermec has the burden of proving its right to payment via Section 3.5.

[77]   DX-30 at 6 (December 21, 2016 Honeywell RFID contract assessments project status presentation).

stated its next step was "[d]iscuss[ing] with [Intermec] re: reserve % and using adjusted unit price (cost of the product) for NSV computation."[78]  The following month EY met with Ms. Schwencer who stated in an email to EY: "I believe in our meeting from the prior week *we* had clarified that *they* were not allowed to use the 'cost of RFID' within the bundle sold."[79]  After Intermec's instruction, EY acquiesced to Intermec's direction and concluded that the gross invoice price should be used to calculate royalties.[80]

This is not the only instance of Intermec's seemingly sole direction of EY's actions.

Two other examples the Court finds significant.  First, in an internal email between the EY auditors, an EY auditor stated that "[f]or our call with [Mr. Nefzer] on Monday, [Ms. Schwencer] wants us to understand" a list of issues Ms. Schwencer raised.[81]  Second, while EY was in the late stages of conducting the audit, EY emailed Mr. Nefzer and reported that it had been "directed by [Intermec] to 'put our pencils down' and close out the report."[82]  Neither TransCore, nor EY had any say here.  Intermec made that call ending the audit on its own.

---

[78]  *Id.* at 3.

[79]  DX-31 at 2 (emphasis added) (January 2017 emails between EY and Ms. Schwencer).

[80]  EY Report § 1.

[81]  DX-24 at 1 (March 2, 2017 EY internal email).

[82]  JX-4 at 1 (January 2017 emails between Nathaniel Chellel and Richard Nefzer).

Second, the Statement of Work gave Intermec full and unfettered control over the audit with seemingly no substantial input from TransCore. Specifically, the Statement of Work provided that EY "will assist [Intermec] in assessing its contract risks and developing a plan to evaluate the contractual compliance of each Third Party with the terms of the cross-license contracts between [Intermec] and each Third Party."[83] Further, the Statement of Work provided that EY would "provide [Intermec] with weekly progress updates and, at [Intermec]'s request, meet with [Intermec] periodically to review the results."[84] Moreover Appendix A to the Statement of Work directly acknowledged that "EY perform[s] services only for the Client," which was Intermec.[85] And "[t]he Report(s) addresses[ed] only the issues identified by the Client, and [is/are] based solely on information obtained by EY using the procedures specified by the Client or otherwise provided by or on behalf of the Client."[86]

Third, the decision to hire EY was solely made by Intermec. Intermec sent TransCore a letter informing it that Intermec was using its contractual audit rights and had selected EY to conduct that audit.[87] To be sure, audit provisions like the

---

[83] PX-29 ("EY Statement of Work") at 4.

[84] *Id.*

[85] *Id.* at 11 (Appendix A to the EY Statement of Work).

[86] *Id.* (emphasis omitted) (first alteration added, second alteration in original).

[87] JX-9 at 2 (August 15, 2016 letter from Francia Lucio to George McGraw). *See* 4/11/23 Trial Tr. at 41

one here and the action taken thereunder generally requires one of the contracted parties to take the lead. But, having considered the testimony and evidence presented it became evident that EY—through no fault of its own, Intermec made it clear that it (or Honeywell) was driving the audit bus—simply was not the "independent" actor anticipated by Section 3.5. Yet, it was only the result of such actor that could trigger Section 3.5 and that might result in breach therethrough had payment not been made thereunder.

Given the trial evidence, the Court cannot find, by a preponderance of the evidence, that EY was the independent third party contemplated by the Agreement. Thus Section 3.5 cannot be invoked here and TransCore cannot be liable for its refusal to pay EY's royalty calculation. Accordingly, the Court finds against Intermec on its claim of breach under Section 3.5 for failure to pay that sum.

But, ironically, that does not mean TransCore was right in its method of calculating royalties on multiprotocol readers.

---

Q. I want to refer you to JX-10, which hopefully is in your binder. And have you seen JX-10 before?

A. Yes.

Q. And what is this document?

A. This is an email from Honeywell providing the letter to George McGraw and an email introduction announcing the Ernst & Young upcoming audit.

-20-

## 2. TransCore Was Required by Section 3 to Pay Intermec for the Use of Its Licensed Products.

Section 3.1 provides that TransCore was to pay Intermec:

> (i) a running royalty of 2.5% on the Net Sales Value of any Licensed RFID ASICs leased, sold or otherwise transferred by Company on or after January 8, 2008 and continuing through the end of the Term; and (ii) a running royalty of 3.0% on the Net Sales Value of any Licensed RFID Tags, Inserts, and/or Labels leased, sold or otherwise transferred by Company on or after January 8, 2008 and continuing through the end of the Term. For avoidance of doubt, no more than the royalty rate specified under this paragraph 3.1 (ii) shall be paid on any Licensed RFID Tag, Insert and/or Label even though such product may incorporate a Licensed RFID ASIC;

> and (iii) a running royalty of 7.0% on the Net Sales Value of any Licensed RFID Readers (fixed or portable) leased sold or otherwise transferred by Company on or after January 1, 2008 and continuing through the end of the Term.[88]

Exhibit 1 (Additional Definitions) to the Agreement defines Net Sales Value as:

> (i) the gross invoice price or gross invoice fee received by Company for a Licensed Product in a transaction at arm's length for monetary consideration, less (ii) allowances for returns or credit for bad debts less (iii) shipping; insurance, and taxes (to the extent separately stated on the invoice), less (iv) any RFID royalties paid by Company in a transaction at arm's length to any Third Party, less (v) any amount paid by Company to Intermec for an RFID product that is incorporated into the Licensed Product sold or leased or otherwise transferred by Company. In the case of a transaction not at arm's length or a transfer of Licensed Products for other than monetary consideration, or the transfer of Licensed Products for other than monetary consideration, Net Sales Value means the price at which Company or a similarly situated Third Party sells comparable

---

[88] Agreement § 3.1.

quantities of Licensed Products at approximately the same time and in the same or similar markets in transactions at arm's length.[89]

Section 1.8 of the Agreement defines Licensed Products as:

RFID ASICs, RFID Inserts, Tags and/or Labels, Fixed RFID Readers, Portable RFID Readers, RFID Printers, RFID software and systems which incorporate such products and software) [sic] which, but for the licenses granted herein, would infringe one or more of the lntermec Licensed Patents, but excluding products and software offered for sale, sold, or otherwise transferred bearing an Unauthorized Brand.[90]

A "Licensed Product" is a product "but for the licenses granted herein, would infringe one or more of the lntermec Licensed Patents."[91] Both sides agree that for a single protocol device the entire device constitutes the Licensed Product. But they part ways on whether that is so for a multiprotocol device.

To TransCore, isolating a component using Intermec-patented technology (such as a daughterboard) leaves a multiprotocol device that doesn't utilize "one or more of the Intermec Licensed Patents," which means the Licensed Product is the component using Intermec-patented technology (such as the daughterboard) and not the entire multiprotocol device.[92] To Intermec, a Licensed Product must refer to the

---

[89] *Id.*, Ex. 1.

[90] *Id.* § 1.8.

[91] *Id.*

[92] TransCore's Post-Trial Opening Br. at 21 (citing Agreement § 1.8); *id.* at 22 ("Therefore, the daughterboard or transceiver board is the Licensed Product.").

entire multiprotocol reader because the Intermec-patented component alone—that upon which TransCore would like to calculate its royalty obligation—does "not qualify as a 'Licensed Product'" nor does that component alone "meet the definition of any RFID product category found in the definition of Licensed Product."[93]

Intermec's correct. Once the component using Intermec-patented technology was placed therein, a multiprotocol reader became for the Agreement's purposes a "Fixed RFID Reader[]" or a "Portable RFID Reader[]." Accordingly, the royalty was to be calculated on that Agreement-defined reader's gross invoice price.

While it might have made better business sense for TransCore to strike a deal where it only paid a royalty on an agreed-upon value of the Intermec-patented component, that's not the deal it struck with Intermec.[94]

Both Intermec and TransCore rely on the quarterly reports in support of their respective interpretations. TransCore says that Intermec had the ability to calculate the adjusted sales price using the numbers provided in the quarterly report but failed to do so.[95] Intermec says the quarterly report was devoid of any information specifying that an adjusted price was being used.[96]

---

[93] Intermec's Post-Trial Opening Br. at 21-23 (citing 4/11/23 Trial Tr. at 202-04, 206).

[94] The Court enforces the Agreement as written—good or bad—it doesn't rewrite it. *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (stating Delaware courts will "not rewrite [a] contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal").

[95] TransCore's Post-Trial Opening Br. at 24.

[96] Intermec's Post-Trial Opening Br. at 22-24.

The royalty reports feature categories such as Shipments by Accounts; Part Info; Quantity; Revenue; Unit Calculation Values; and Total Expenses.[97] They also include specific part numbers and part descriptions as well as specific unit sales prices.[98] Missing from these detailed reports is any mention of adjusted price.[99]

By way of example, in the 2018 Q3 Quarterly Report, the first line item lists a multiprotocol reader with a unit sales price of $███ and a total royalty amount of $███ To get to $███—given that two units were purchased, the 7% royalty, 1.6% extended revenue, and $███ reserve cost per unit—the input price would have to be $███ That is the "adjusted price" TransCore came up with. But that specific figure is missing from the quarterly report. All that is listed is the gross invoice price (unit sales price) and the quantity.

TransCore says that the adjusted price came from a price list.[100] This was

---

[97]  JX-43 (2018 Q3 Quarterly Report).

[98]  *Id.*

[99]  *See* Quarterly Royalty Reports; *see* 4/11/23 at 29-30:

> Q. And what was the unit price that was charged to the customer on this particular TransCore action?
>
> A. $███
>
> Q. And what is the price for the SeGo licensed product in this product upon which TransCore calculated the royalty?
>
> A. ███
>
> Q. And how can you tell that from looking at that line item?
>
> A. I can't tell from that particular piece of information.

[100]  TransCore's Post-Trial Answering Br. at 19-20.

brought out in testimony by George McGraw, who testified that he created and possessed a price list that listed the adjusted price for each multiprotocol device.[101] But Mr. McGraw admitted that he did not share this price list with Intermec when the quarterly reports were submitted.[102] And as the Court just illustrated, unless one worked the math backward, one wouldn't know the gross unit sales price printed on the royalty report *was not* the actual number used to calculate the royalty.

Intermec's former general counsel, Ms. Harwell, testified that the parties intended royalty payments be calculated from the gross invoice price because using a different figure, such as an adjusted price, required a post-contractual methodology that involved judgment calls that inevitably would "lead to litigation"—something neither party wanted.[103]

---

[101] 4/5/23 Trial Tr. at 105-06.

[102] *Id.* at 107

> Q. Were those price lists shared with Intermec when you surveyed your quarterly reports?
>
> A. I've got to think about that for a minute. No. I don't believe so. . . .
>
> Q. And, again, those were not documents that were transmitted with the quarterly reports; correct?
>
> A. I don't believe so. No.

[103] 4/3/23 at 93-94

> Well, I'm not sure what kind of adjusting they had been talking about, but the point of the net sales calculation in this contract from my perspective was to get to a market price for the device that they sold and use that as a starting point for the calculation. There was a list of permissible deductions from the gross invoice price, but what I did not want and what I don't think the contract permits is someone to basically make their best guess about how to allocate that market price between protocols or between technologies or any of that. So allocation was not one of the things that I would have agreed to because it involves judgment calls that lead to

Ms. Harwell's testimony is confirmed by the structure and text of the royalty provision. Nowhere does the Agreement provide for a price adjustment methodology. If the parties intended that structure, it would have been expressly laid out in the Agreement. And given its absence, it's reasonable to conclude the parties didn't intend to use an adjusted price to calculate royalties, since using a methodology not listed in the Agreement all but certainly requires extra-contractual judgment calls that form the fodder for litigation in this Court.

The Court finds by a preponderance of the evidence that the parties intended for royalties to be calculated using the gross invoice price, and not an adjusted price. This finding is based on the text of the Agreement. Nowhere therein does one find TransCore's adjusted price methodology.

Even if the Court were to look beyond the four-corners of the Agreement, which it really need not do as it finds the Agreement clear on this point, the extrinsic evidence supports the same outcome. That evidence includes the absence of any contemporaneous communications stating that adjusted price would be used, the absence of any clearly-identified adjusted price penned on the quarterly reports, and the weight given to Ms. Harwell's testimony.

Accordingly, the Court finds that TransCore's use of an adjusted price to

litigation, and I was trying to get us out of disputes with TransCore about the license agreement.

-26-

calculate royalties resulted in underpayment to Intermec and breached the Agreement. That said, while it was troubling how TransCore went about paying and reporting the royalties at various points, its defenses to Intermec's breach claim are nonetheless successful.

### 3. TransCore's Successful Defenses

TransCore asserts that (1) Intermec's breach-of-contract claim is barred by acquiescence, and (2) certain of Intermec's payment obligations are barred by the statute of limitations.

### a. Intermec acquiesced to TransCore's royalty methodology.

TransCore says Intermec's breach-of-contract claim is barred by acquiescence. Specifically, TransCore says that it disclosed its methodology in 2014 and 2019 without objection from Intermec.[104]

The 2014 disclosure was a 2014 email chain between Floyd Carpenter and Sergio Robles.[105] In that email chain TransCore laid out its interpretation that royalties are due for multiprotocol devices only on the "protocol specific sales price."[106] TransCore says that because Mr. Robles was told about the methodology and did not raise any issue with it, TransCore was led to believe its methodology

---

[104] TransCore's Post-Trial Opening Br. at 24; DX-1 (February 2014 email chain between Sergio Robles and Floyd Carpenter); DX-6 (February 2019 email chain between Floyd Carpenter and Adriana Espinosa).

[105] DX-1 at 1-2.

[106] *Id.* at 2.

was correct, and so Intermec acquiesced to TransCore's methodology.[107]

As observed by the Delaware Supreme Court in *Klaassen v. Allegro Development Corp.*, acquiescence occurs when the claimant:

> [H]as full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.[108]

"For the defense of acquiescence to apply, conscious intent to approve the act is not required, nor is a change of position or resulting prejudice."[109] "Application of the standards underlying the defense of acquiescence is fact intensive, often depending, . . . on an evaluation of the knowledge, intention and motivation of the acquiescing party."[110]

The first inquiry is determining whether the claimant has "[k]nowledge, actual or imputed, of all material facts."[111] "An employee's knowledge can be imputed to her employer if she becomes aware of the knowledge while she is in the scope of employment, her knowledge pertains to her duties' as an employee, and she has the

---

[107] TransCore's Post-Trial Opening Br. at 24.

[108] 106 A.3d 1035, 1047 (Del. 2014) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 582 (Del. Ch. 1998)).

[109] *Id.* at 1047 (citations omitted).

[110] *Julin v. Julin*, 787 A.2d 82, 84 (Del. 2001).

[111] *Frank v. Wilson & Co.*, 32 A.2d 277, 305 (Del. 1943).

authority to act on the knowledge."[112]  The *Restatement (Third) of the Law of Agency*, states that:

> For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal, unless the agent:
>
> (a) acts adversely to the principal as stated in § 5.04, or
>
> (b) is subject to a duty to another not to disclose the fact to the principal.[113]

The rule is based on the idea that "[i]mputation creates incentives for a principal to choose agents carefully and to use care in delegating functions to them."[114]  Moreover, "imputation encourages a principal to develop effective procedures for the transmission of material facts, while discouraging practices that isolate the principal or coagents from facts known to an agent."[115]

Sergio Robles was an Intermec royalty analyst.[116]  Part of his responsibility was "process[ing]" royalty payments.[117]

---

[112] *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1200-01 (Del. 2015) (cleaned up).

[113] RESTATEMENT (THIRD) OF THE LAW OF AGENCY § 5.03 (2006 Supp. May 2023).

[114] *Id.*, cmt. b.

[115] *Id.*

[116] Stephanie Schwencer Depo. Tr. at 43 (Nov. 9, 2022).

[117] DX-1 ("I just want to double check the following with you before I process this royalty report for good."); 4/3/23 Trial Tr. at 23; *see also* D.X. 1 at 1 ("I hope you can help me as this is the first time I process one of your royalty reports. I am just getting familiar with all [sic] the Intermec contract.").

According to Intermec, TransCore deceived a new analyst, whom Mr. Nefzer knew had not processed these royalty payments before.[118]  To hear Intermec tell it, after receiving Mr. Robles's email asking why the numbers on the quarterly report were not adding up,[119] Mr. Carpenter and other senior TransCore managers worked together to "craft[] a response,"[120] and when Mr. Robles accepted the response and processed the payment, TransCore celebrated "the 'good news.'"[121]

In her deposition, Intermec's finance director Stephanie Schwencer stated that all Mr. Robles "cared about was the math work" and "[i]f he had understood what [the communications] said, he would have referred it to his supervisor."[122]

But Mr. Robles's material job duties were more than just checking the math— his responsibility was to process the royalty payments.[123]  Mr. Robles had all the material facts available to him.  The fact that he might not have understood the years-later ramification of his actions is no defense.  Principals must "choose agents carefully and . . . use care in delegating functions to them" and "develop effective

---

[118]  Intermec's Post-Trial Answering Br. at 21 (citing 4/11/23 Trial Tr. at 166).

[119]  DX-1 at 1 ("Per our phone conversation, attached is the document I received.  I would like to know how the Total Expense amount (Royalty?) is calculated.  I see a 3% percent royalty rate being used, and also a 1.6% Res rate which I do not know what is for.  Also the Frt $ column, is it a freight deduction?").

[120]  Intermec's Post-Trial Answering Br. at 21 (citing PX-3).

[121]  *Id.* at 22 (quoting PX-4).

[122]  Stephanie Schwencer Depo. at 153-58 (Nov. 9, 2022).

[123]  *See supra* note 117.

procedures for the transmission of material facts."[124]  If Intermec did not want to be responsible for Mr. Robles's actions it should have delegated to him less authority or established effective procedures for the transmittal of important communications to higher-level managers.

According to Intermec, Mr. Robles "made the mistake of trusting" TransCore.[125]  But the mistake, if any, is that Intermec delegated too much authority to someone it now dubs a junior analyst who had never processed a royalty payment before.

Mr. Robles processed the payment fully aware that an adjusted price was being used.[126]  His actions amounted to acquiescence of the now-challenged act.[127]

According to his supervisor, Stephanie Schwencer, Mr. Robles should have escalated the issue,[128] and while that may be true, Mr. Robles had the authority to act.  Intermec is therefore bound by Mr. Robles's actions.

As a last resort, Intermec adds that Mr. Robles's actions effectively either amended or waived portions of the Agreement, which under Sections 10.2 and

---

[124]  RESTATEMENT (THIRD) OF THE LAW OF AGENCY § 5.03 cmt. b.

[125]  Intermec's Post-Trial Answering Br. at 22.

[126]  DX-2 at 1 (February 2014 emails between Floyd Carpenter and Sergio Robles).

[127]  TransCore believed that the royalty methodology it had used historically under the Agreement was correct all along and now, when squarely questioned, had been approved because of Mr. Robles's inquiry and processing of the royalty payment.  PX-4 ("The good news is that Sergio is complete in his analysis of Q4's 2013 royalties.").

[128]  Stephanie Schwencer Depo. at 153-58 (Nov. 9, 2022).

10.3 of the General Terms and Conditions (Exhibit 2 to the Agreement), respectively, required signed writings by authorized representatives of Intermec and TransCore.[129] But the presence of a 'waiver ineffective' or 'amendment ineffective provision' will not bar an acquiescence defense.[130]

Accordingly, the Court finds that Intermec acquiesced to TransCore's methodology and thus Intermec's breach-of-contract claim for underpayments post-Q3 2014 is barred by the equitable doctrine of acquiescence.

### b. Intermec failed to mount a viable defense to TransCore's statute of limitations arguments.

TransCore says that if Intermec is correct about its breach-of-contract claim it cannot recover from before March 25, 2017, because Intermec waited until

---

[129] Intermec's Post-Trial Answering Br. at 23; Agreement, Ex. 2 §§ 10.2, 10.3.

[130] *XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 659 (Del. Ch. 2022):

> [N]otwithstanding a contractual provision stating that a contract cannot be modified except in writing, a court may find that the parties modified their obligations orally, by conduct, or through waiver. Likewise, notwithstanding a contractual provision that states that no party can waive any rights under an agreement, a court may find that a right has been waived.

(citations omitted); *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *29 n.273 (Del. Super. Ct. July 29, 2021) ("[C]ontractually afforded protections against waivers themselves may be waived if facts so indicate." (citing *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 27 A.3d 522, 529-30 (Del. 2011)); *see Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972):

> [A] written agreement does not necessarily govern all conduct between contracting parties until it is renounced in so many words. The reason for this is that the parties have a right to renounce or amend the agreement in any way they see fit and by any mode of expression they see fit.

March 25, 2020, to bring its action.[131]  The Agreement called for quarterly royalty payments, so each alleged underpayment amounts to a separate breach.[132]  Because Intermec filed its complaint on March 25, 2020, any claim arising before March 25, 2017, would be untimely absent a tolling exception.  Intermec foregoes a tolling defense and says that because Section 3.5 was breached, its claims are timely.[133]  Having found that Section 3.5 wasn't breached, Intermec is left without a defense and implicitly waives any potential tolling argument.[134]

But even if the Court were to find that Intermec did not waive its defense to TransCore's statute of limitations argument, the statute of limitations would still bar Intermec's remaining claim here.  That is because Intermec was on inquiry notice of the adjusted price methodology.[135]  To be on inquiry notice, a "person[] of ordinary intelligence and prudence would [need to] have facts sufficient to put them on inquiry which, *if pursued*, would lead to the discovery of the injury."[136]  Here the

---

[131]  TransCore's Post-Trial Opening Br. at 34-35.

[132]  *Sutherland v. Sutherland*, 2013 WL 2362263, at *5 (Del. Ch. May 30, 2013) ("The statute of limitations would then accrue upon, and for, each quarterly payment made to Cimarron for these overages.").

[133]  Intermec's Post-Trial Answering Br. at 29-33.

[134]  *Brown v. United Water Delaware, Inc.*, 3 A.3d 272, 276 (Del. 2010) (finding "waiver occurs where a party intentionally relinquishes an available contention or objection" (citations omitted)).

[135]  *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998) (finding "the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong" (emphasis in original) (citation omitted)).

[136]  *Id.* at *7 (emphasis in original) (citation omitted).

Court finds that (1) Intermec had the ability to order an audit of the quarterly reports (and chose not to), and (2) the quarterly reports contained enough information (if one worked backwards through the math) to find out that an adjusted price was being used to calculate royalties.

Accordingly, Intermec was on inquiry notice since at least the second quarter of 2012 when Intermec received the first quarterly report.[137]  As such, even if Intermec did not waive its defense to TransCore's statute of limitations argument, its remaining claims would still be barred by that limitations period.

**B. THE COURT FINDS AGAINST TRANSCORE ON ITS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING COUNTERCLAIM.**

In TransCore's remaining counterclaim it says that the Agreement includes an implied obligation that Intermec must return any overpayment made by TransCore and that TransCore indeed overpaid.[138]

Intermec first says that TransCore hasn't satisfied the requirements for finding an implied covenant exists.[139]  Second, it asserts two defenses: it says (1) if the Court finds that TransCore breached the Agreement by underpaying Intermec, then TransCore's counterclaim is barred by the prior material breach doctrine[140]; and

---

[137] JX-18.

[138] Countercl. ¶¶ 90-97 (D.I. 26).

[139] Intermec's Post-Trial Opening Br. at 34-35.

[140] *Id.* at 35.

(2) TransCore's counterclaim is barred by the voluntary payment doctrine.[141]

Third, Intermec says TransCore failed to meet its burden that Intermec breached an implied covenant.[142]

**1. TransCore Has Successfully Invoked the Implied Covenant of Good Faith and Fair Dealing.**

As the Court observed earlier in this case, "[w]ielding the implied covenant is a 'cautious enterprise.'"[143] "As a result, implying the covenant should be 'a rare and fact-intensive exercise, governed solely by issues of compelling fairness.'"[144]

TransCore insists that the overpayment issue was "so obvious" it didn't need to be expressly included in the Agreement.[145]

To counter, Intermec first notes that TransCore was solely responsible for payment of royalties and that it was financially disadvantageous to overpay.[146] But just because the Agreement gave TransCore the responsibility to pay its due does not mean the Agreement addressed underpayment.

---

[141] *Id.* at 31-33.

[142] Intermec's Post-Trial Answering Br. at 6-15.

[143] *Intermec*, 2021 WL 3620435, at *12 (quoting *Nemec*, 991 A.2d at 1125).

[144] *Id.* (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)).

[145] TransCore's Post-Trial Opening Br. at 13-14 (quoting *Intermec*, 2021 WL 3620435, at *27).

[146] Intermec's Post-Trial Answering Br. at 3 (citing 4/5/23 Trial Tr. at 77-78; 4/11/23 Trial Tr. at 119-20); 4/5/23 Trial Tr. at 78:

> Q. And TransCore had a financial incentive to make sure especially the quantities were correct so they didn't face the risk of overpayment; correct?
>
> A. Correct.

Intermec next points to *Oxbow Carbon & Minerals Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*[147] and *Nemec v. Shrader*[148] and says that because the overpayment issue "could have been anticipated" that it cannot be filled with an implied covenant.[149] But our Supreme Court declined to find an implied covenant in *Oxbow* because the requested implied covenant there attempted to rebalance certain bargained-for protections.[150] And in *Nemec*, the Supreme Court affirmed the trial court's rejection of an implied covenant that an option needed to be redeemed at a certain time, since, as the Supreme Court found, "the Stock Plan explicitly authorized the redemption's price and timing."[151]

That is not the situation here. The overpayment issue was not discussed at all.

---

[147] 202 A.3d 482, 507 (Del. 2019).

[148] 991 A.2d 1120 (Del. 2010).

[149] Intermec's Post-Trial Opening Br. at 34 (quoting *Oxbow*, 202 A.3d at 507).

[150] *Oxbow*, 202 A.3d at 507. In *Oxbow*, our Supreme Court "decline[d] to apply the implied covenant . . . because no gap exist[ed] concerning the admission of the Small Holders, and because the admission of new Members and their impact on the Exit Sale process could have been anticipated." *Id.* While Intermec goes right to the Court's concluding phrase that the gap "could have been anticipated," it does so without examining those few words' context. Intermec's Post-Trial Opening Br. at 34 (quoting *Oxbow*, 202 A.3d at 507).

In *Oxbow,* the Court quoted its previous *Nemec* decision, where it observed: "Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, . . . later adversely affected one party to a contract." *Oxbow*, 202 A.3d at 507 (alteration added) (quoting *Nemec*, 991 A.2d at 1128). Contrary to Intermec's reading, *Oxbow* and *Nemec* do not bar any covenant that *could have* been anticipated when drafting. Rather, they remind us that an implied covenant is not cognizable where it is engaged injudiciously to "rebalance economic interests" visited by later-realized events that "could have been anticipated." *Id.* (quoting *Nemec*, 991 A.2d at 1128).

[151] *Nemec*, 991 A. 2d at 1126.

Naturally the parties could have included such a term, but their failure to do so doesn't doom an implied covenant claim. That is because a provision providing that refunds are owed for overpayments under a quarterly royalty contract is the type of "obvious" omission that is well-suited for an implied covenant as it doesn't change any bargained-for protections.[152]

Accordingly, the Court finds here there is an implied covenant in the Agreement to return any overpayment TransCore made to Intermec.[153]

### 2. Intermec's Defenses Do Not Bar TransCore's Counterclaim.

### a. TransCore did not commit the prior material (Section 3.5) breach pled.

Intermec says that TransCore cannot recover under its overpayment theory because it materially breached the Agreement first, so under the prior material breach doctrine TransCore's counterclaim should be barred.[154] Because the Court has found that TransCore did not breach Agreement Section 3.5, as pled, Intermec's prior material breach defense fails.

---

[152] *Dieckman v. Regency GP LP*, 155 A.3d 358, 361 (Del. 2017) (finding "so obvious" "a requirement that the general partner not engage in misleading or deceptive conduct to obtain safe harbor approvals").

[153] The Court makes this finding after examining the entirety of the trial evidence on Transcore's implied covenant claim and mindful that "one generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement"—here Intermec would say receiving royalty payments—and mindful too that the covenant shouldn't be employed as some equitable remedy meant to rebalance the parties' financial interests or otherwise provide a protection not obtained at the negotiating table. *Dunlap*, 878 A.2d at 441; *see Nemec*, 991 A.2d at 1126-28.

[154] Intermec's Post-Trial Opening Br. at 35.

### b. The voluntary payment doctrine excuses only the '632 patent underpayment claim.

Intermec also says that the voluntary payment doctrine defeats TransCore's implied covenant counterclaim.[155] To Intermec, "TransCore's alleged overpayments are not the result of any 'mistake of fact,' they are the result of a unilateral mistake arising from gross administrative incompetence."[156] Intermec continues that a mistake of fact could not have occurred because "TransCore had full knowledge of the facts" and "knew exactly which Intermec patents were at issue, and it had access to the products, the design schematics, and the engineers."[157]

"The voluntary payment doctrine provides that 'where money has been voluntarily paid with full knowledge of the facts, it cannot be recovered on the ground that the payment was made under a misapprehension of the legal rights and obligations of the person paying.'"[158]

"The negligence of the payor in mistakenly compensating the payee, alone, is no bar to restitution of the sum paid. However, where the mistake of fact was not

---

[155] *Id.* at 31-33.

[156] *Id.* at 33.

[157] Intermec's Post-Trial Answering Br. at 16-17.

[158] *Winshall v. Viacom Int'l, Inc.*, 2019 WL 960213, at *15 (Del. Super. Ct. Feb. 25, 2019) (quoting *Nieves v. All Star Title, Inc.*, 2010 WL 2977966, at *6 (Del. Super. Ct. Jul. 27, 2010)).

TransCore argues that the voluntary payment doctrine should not be applied here because it "is better suited to equity." TransCore's Post-Trial Answering Br. at 11. But this Court has applied this doctrine and the Court here finds no reason why it cannot, or should not, be invoked in this instance. *See Intermec*, 2021 WL 3620435, at *15 n.140.

-38-

shared by the payee, *i.e.*, in cases of unilateral mistake on the payor's part, equitable principles may bar restitution of the sum paid."[159]

The term "voluntary payment" might seem to suggest that the payor must have enthusiastically paid an excess sum (only to seek recoupment later on). But the voluntary payment doctrine doesn't require true voluntariness—if it did then successfully invoking the doctrine in a business dispute would be close to impossible. The doctrine, instead, refers to the situation where a business "choose[s] to act on the basis of inadequate knowledge, assuming the risk that further information may reveal the choice to have been less than optimal."[160]

So, in addition to the requirement that the mistake be a mistake of fact and not law, the Court must also assess whether the mistake of fact was actually a mistake, or whether it was a calculated risk. If it is the latter, the voluntary payment doctrine will bar the claim. Here the Court must look at TransCore's overpayment counterclaim as it relates to (1) the EM4285 tags, and (2) the '632 patent.

### i. *The EM4285 Tags*

Concerning the EM4285 tags, Mr. Nefzer explained that the accounting team made a mistake based on an assumption it took from the project management

---

[159] *Home Ins. Co. v. Honaker*, 480 A.2d 652, 654 (Del. 1984) (citations omitted).

[160] RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 6 cmt. e (2011 Supp. May 2023).

team.[161]  According to Mr. Nefzer, the accounting team did not realize that Intermec's EM4285 tag was different than its predecessor.[162]

Intermec says that "TransCore's failure to determine whether a product satisfied the definition of 'Licensed Product' because it practiced one or more of Intermec's royalty bearing Licensed Patents before it paid royalties was a mistake of law, not a mistake of fact."[163]  For support Intermec cites to *CG Technology Development, LLC v. FanDuel, Inc.*[164] But that federal patent action doesn't help here.  It seems Intermec is arguing that patent claim construction is a question of law.  Maybe so.  But here the TransCore accounting team did not act under a mistake concerning the construction of a patent.  It acted under a mistake that a certain current product was identical to a previous product.  That is a mistake of fact. Moreover, it was not a calculated risk, it was simply a communications error between teams.

Accordingly, the voluntary payment doctrine would not bar the overpayment counterclaim concerning the EM4285 tags, if indeed the Court found by a preponderance of the evidence that TransCore did not, at the time alleged, practice

---

[161]  4/11/23 Trial Tr. at 91-93.

[162]  *Id.*

[163]  Intermec's Post-Trial Answering Br. at 15; *see* Intermec's Post-Trial Opening Br. at 31-32.

[164]  442 F.Supp.3d 840, 845 (D. Del. 2020).

*any* Intermec patents covered by the Agreement.[165]

### ii. *The '632 Patent*

Not so, though, for the TransCore products that would be royalty-free if they no longer practiced Intermec's '632 patent.[166] On these products, instead of blaming miscommunication, Mr. Gravelle blames his other job duties as the reason he didn't check the expiration date of the patents.[167]

If this supposed expiration occurred and passed without TransCore acting on it, the overpayments were the product of a TransCore business decision to forego some more regular periodic review of patent expiration dates and instead check them on an 18- to 24-month basis.[168] This is the type of calculated risk the voluntary payment doctrine bars.

According to Mr. Gravelle, the witness TransCore proffered as to patent

---

[165] *Intermec*, 2021 WL 3620435, at *15 ("When 'money [is] paid under a mistake of fact,' even if the mistake is unilateral, the errant payment *may* be excused and recovery possible." (alteration in original) (emphasis added) (quoting *Honaker*, 480 A.2d at 653-54)).

Intermec's citation to *Home Insurance Company v. Honaker* is unhelpful. There, our Supreme Court held recovery was barred for an insurer's erroneous payment because compensating the insurer for the overpayment would, in effect, have forced the appellee "to disgorge a benefit received from a separate source for entirely different reasons." 480 A.2d at 655. That misalignment isn't present here.

[166] And assuming those products identified in TransCore's overpayment counterclaim did not practice any other Agreement-covered Intermec patent—an assumption not easy to make at all given the paucity of evidence on this issue.

[167] 4/6/23 Trial Tr. at 34 ("My involvement in that was really to sort of on as I had time and availability, which would run every 18 months or over an 18 to two-year period sort of on average.").

[168] *Id.*

expiration, he had all the information he needed to determine that the '632 patent had expired. The information was not with another person or with another team—the information was squarely with him. Moreover, the Agreement gave TransCore the responsibility of tabulating the quarterly reports and making the quarterly royalty payments. The fact that Mr. Gravelle did not check to see if TransCore was paying for expired patents reflects a decision about where Mr. Gravelle thought it was best to deploy his resources and time—it wasn't checking royalty expiration dates on a regular basis to avoid overpayment. The risk that TransCore's failure to check expiration dates would result in overpayment was a known and calculated risk.

Accordingly, the voluntary payment doctrine does bar the '632 patent overpayment claim.

### 3. TransCore Hasn't Carried Its Burden to Prove that Intermec Breached the Covenant of Good Faith and Fair Dealing by Refusing to Reimburse TransCore for Its Purported Overpayment.

To recover under the implied covenant of good faith and fair dealing, a party must prove "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[169]

As stated above, TransCore has successfully shown the Agreement contained an implied obligation to repay royalty overpayments. Now, TransCore must show Intermec actually breached that implied covenant.

---

[169] *See Baldwin*, 283 A.3d at 1117-18 (citation and internal quotation marks omitted).

TransCore says Intermec breached the obligation by failing to repay overpayments due because: (1) TransCore product EM4285 "did not practice Intermec patents"; and (2) TransCore paid for expired patents.[170] The Court already found the second breach claim was barred by the voluntary payment doctrine leaving just the EM4285 breach claim at issue.

Mr. Nefzer and Mr. Gravelle were the only two witnesses to testify as to EM4285. And the source of Mr. Nefzer's belief that EM4285 did not practice any Intermec patent was Mr. Gravelle.[171]

In his affidavit, Mr. Nefzer stated that "[a]fter Intermec filed its Complaint . . . in 2020, TransCore investigated whether it had made any overpayments of royalties to Intermec."[172] Mr. Nefzer said the Engineering Department investigated and determined that EM4285 did not practice *any* Intermec patents.[173] But in making this determination, "the Engineering Department did not review schematics or perform a tear down of any product in analyzing this issue because the individuals involved with this investigation had no need to do so, given their deep and lengthy familiarity with TransCore products."[174]

---

[170] TransCore's Post-Trial Opening Br. at 3-4 (citing 4/6/23 Trial Tr. at 40-41).

[171] 4/11/23 Trial Tr. at 91-92.

[172] PX-31 ("Nefzer Affidavit") ¶ 5.

[173] *Id.* ¶ 7.

[174] *Id.* ¶ 6.

Absent any documented analysis, TransCore was left with Mr. Gravelle's testimony. He testified that the earlier design of EM4285 used Intermec patents but, he believed, the later product did not.[175] This averment was supported by only Mr. Gravelle's word—EM4285 did not practice any Intermec patents—with little substantive support.[176]

The Court has no doubt that Mr. Gravelle is a talented and knowledgeable engineer who truly believes that the latter version of the EM4285 tag no longer practices any Intermec patent. But left with only his word, the Court must grapple with whether that is enough. It isn't. And absent any additional support, the Court cannot find by a preponderance of the evidence that TransCore has met its burden to prove the identified EM4285 tags practiced no Agreement-covered Intermec patents. Accordingly, TransCore has not shown that Intermec breached the implied covenant to return overpayments on those EM4285 products.[177] In short, for lack of credible

---

[175] 4/6/23 Trial Tr. at 21-22.

[176] *Id.* at 116.

> Q. So you concluded as part of your testimony in this case that the EM4285 did not practice any Intermec patents. Right?
>
> A. Right.

[177] In its answering brief, TransCore says that "[b]y not arguing that TransCore failed to carry its burden of proof on the counterclaim, Intermec implicitly concedes that there was an overpayment of $1,940,838 that Intermec never returned." TransCore's Post-Trial Answering Br. at 8.

To TransCore, Intermec's failure to argue that TransCore didn't meet its burden to show Intermec breached an implied covenant and resultant damages constitutes waiver. But it's TransCore's burden that never shifted. Here, TransCore simply failed to show breach. It tried to make its affirmative case with a single fact witness and no other support. That attempt failed.

and sufficient evidence of overpayment on the EM4285 products, TransCore's counterclaim on such fails.

## VI. CONCLUSION

Intermec and TransCore entered into a cross-license agreement where TransCore would pay Intermec quarterly royalties for use of its patents. Relevant here, the parties intended that royalties would be paid on the gross invoice price of RFID readers including any of the Agreement-identified Intermec-patented technology. But from the start, it appears, TransCore decided only to calculate royalties based on the adjusted price it had devised for certain multiprotocol devices. That resulted in multi-year underpayments to Intermec. Along the way, Intermec was made aware of TransCore's adjusted price methodology. Intermec elected to continue to process the payments calculated via that methodology quarter-after-quarter with that awareness.

Eventually, after a change in control, Intermec invoked its audit rights and hired EY to conduct the audit of TransCore's quarterly royalty payments. EY—who was hired by and functionally worked at the direction of Intermec—reported that TransCore underpaid Intermec. Intermec eventually demanded payment, which TransCore rejected, thus commencing this action. TransCore, in turn, examined its books and suggested that it had overpaid Intermec because certain of Intermec's patents had either expired or were not being used in TransCore products.

Following a six-day bench trial the Court now finds both Intermec's breach-of-contract claim and TransCore's breach of the implied covenant of good faith and fair dealing counterclaim fail. Intermec acquiesced to TransCore's methodology. And TransCore voluntarily paid Intermec for an allegedly expired patent it easily should have known expired (if it had) and it failed at trial to show it overpaid for a patent it claimed was no longer being used.

Accordingly, the Court awards no damages. Neither party is entitled to relief. The Court therefore leaves the parties where they began in this litigation, but with a few more answers as to where they may be headed if they continue their relationship.

While this is likely not the outcome either party hoped for, it is the outcome each created by its own action—both during the life of the Agreement and during the trial.

## VII. VERDICT AND JUDGMENT

**ON INTERMEC'S COMPLAINT:**

- Count I – Breach of Contract: For TransCore

**ON TRANSCORE'S COUNTERCLAIM:**

- Counterclaim III – Breach of the Implied Covenant of Good Faith and Fair Dealing: For Intermec

**IT IS SO ORDERED.**

_____
**Paul R. Wallace, Judge**

Original to Prothonotary
cc: All counsel via File & Serve

-46-